UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

LISA PRESSLEY,

                    Plaintiff,

        v.

ABJ HOME CARE INC., and TINA GUO,

                 Defendants.

------------------------------------------------------x

**MEMORANDUM AND ORDER**
24-CV-882 (RPK) (JRC)

RACHEL P. KOVNER, United States District Judge:

Plaintiff Lisa Pressley brings claims under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL") against ABJ Home Care Inc. ("ABJ"), a home-care company where she applied for a job as an office clerk, and Wei "Tina" Guo, a director at ABJ.

After considering the evidence introduced at trial, the arguments of counsel, and the controlling law on the issues presented, I conclude that plaintiff has sustained her burden on all claims. The Court awards plaintiff $20,068.55 in back pay, with pre-judgment interest, and $80,000 in emotional-distress damages against both defendants. The Court also awards $50,000 in punitive damages against defendant ABJ, and $10,000 in punitive damages against defendant Guo.

## FINDINGS OF FACT

The following section constitutes the Court's findings of fact pursuant to Federal Rule of Civil Procedure 52(a)(1). These findings of fact are drawn from witness testimony at trial and the

1

parties' trial exhibits.  To the extent that any finding of fact reflects a legal conclusion, it shall be deemed a conclusion of law to that extent, and vice versa.

Defendant ABJ operates a home-care service in College Point, New York.  Pl.'s Ex. 602. The company employs three office workers along with approximately 200 home health aides.  Trial Tr. 154:12–13, 163:3–4.  As the business grew, so did the paperwork.  *Id.* at 164:12–14.  Defendant Tina Guo, who managed hiring and firing at ABJ and oversaw the company's compliance with ADA guidelines, *id.* at 155:15–18, 162:10–12, decided to hire an additional office clerk.

Plaintiff Lisa Pressley, a left-leg amputee, saw an online job posting by ABJ in July 2023. *Id.* at 14:7–8, 23:21–24:3, 31:17–32:12.  The company was looking for an office clerk who could answer calls and organize documents.  Pl.'s Ex. 601.  She called the number to apply.  Trial Tr. 26:11–13.  When Guo answered, Pressley stated that she had relevant work experience, noting that she had done both "nursing" and "computer work before."  *Id.* at 26:11–13.  Pressley sent her resume and a recommendation letter to Guo via text.  *Id.* at 26:14–19.  Guo called Pressley back, inviting her to "come work tomorrow" at 9:00 a.m.  *Id.* at 26:20–27:9.  At this point, Pressley did not know how much the job would pay or how long it would last.  *Id.* at 81:20–82:14.

The next morning, July 27, 2023, Pressley created a note on her phone to jot down ABJ's address.  *Id.* at 43:2–6, 43:18–23.  She arrived at 8:57 a.m. and texted Guo.  *Id.* at 32:19–24.  One minute later, Guo—who was not at the office that day—called office manager Hailu "Selina" Dong and directed her to let Pressley into the building.  *Id.* at 174:12–21.  Pressley, Guo, and Dong gave conflicting accounts at trial about what happened next.  I find Pressley's testimony to be more credible.

### A.    Pressley's Account

From Pressley's account, she began her first day of work at ABJ on July 27, 2023.  *Id.* at 26:20–23, 32:19–24.  She arrived in a t-shirt and jeans.  *Id.* at 33:19–20.  Finding a prosthetic

cumbersome, Pressley had "tucked in" the left leg of her pants and used crutches to help her walk. *Id.* at 33:21–22, 34:1–12. After she arrived and texted Guo, she saw Dong waiting across the street. Once Dong let Pressley into the office, Dong assigned Pressley a computer and explained that the job consisted of "answering phones and entering data." *Id.* at 33:13–15, 34:21–35:5. After onboarding, which took ten to fifteen minutes, Dong asked Pressley to transfer data from several timesheets into a spreadsheet on the computer. *Id.* at 35:6–17. Pressley started working.

As reflected in phone records admitted into evidence, Pressley received a call from Guo ten to fifteen minutes later, at 9:32 a.m. *Id.* at 36:19–21; Pl.'s Ex. 602. Pressley testified that during the call, Guo asked her why she did not disclose her disability, which Guo said she had learned about via text from an officemate. *Id.* at 37:1–5. Pressley said that she "still can do the work"; Guo demurred, saying that the job also required employees to deliver papers and drive to clients' homes. *Id.* at 37:6–9. While Pressley responded that she could do those things, Guo said that she did not want Pressley to work at ABJ. *Id.* at 37:9–10. Pressley asked to speak with ABJ's manager or owner; Guo said that she was both. *Id.* at 37:13–17. Pressley finally objected to Guo's treatment as discriminatory, prompting Guo to end the conversation and hang up the call. *Id.* at 37:18–20.

After the call, Pressley tried to at least finish the work she had started. *Id.* at 38:15–23. She testified that she took photos of the desk to document that she had "finished the job." *Id.* at 112:23–113:8. Dong quietly gave her an envelope, at which point Pressley left the building. *Id.* at 38:24–39:12. Guo also texted Pressley at 9:39 a.m., informing her that she did not need to stay the hour, apologizing for "wasting [her] time," and explaining that Dong would give her $23. Pl.'s Ex. 602.

Pressley, who had become very upset, went to her car and called several friends, recounting what had happened.  The calls are reflected in the toll records for Pressley's phone.  Pressley also used the messaging application WeChat to speak with two of her friends.  Pressley entered screenshots of two of those WeChat exchanges into evidence at trial, along with English translations.  Pl.'s Ex. 303; Pl.'s Ex. 607; Pl.'s Ex. 302; Pl.'s Ex. 606.  In one of the conversations, Pressley's friend provides advice on obtaining a lawyer.  Pl.'s Ex. 607.

While in her car, Pressley also documented the incident in the note she had created in her phone that morning.  Trial Tr. 41:12–42:1.  She later went to her friends' home, where she opened Dong's envelope and found the $23.  *Id.* at 55:20–24, 56:6–16.

Later, Pressley appended a second summary of the incident to her note.  *See id.* at 42:5–10, 95:8–21.  She used that summary to file complaints with the U.S. Equal Employment Opportunity Commission and the Office of Federal Contract Compliance Programs.  *Id.* at 60:1–9, 62:1–4; Pl.'s Ex. 308; Pl.'s Ex. 307.  In August, Pressley also submitted a complaint with the New York State Division of Human Rights.  Pl.'s Ex. 309.

Pressley testified that her experience at ABJ caused her serious emotional distress.  She stated at trial that the ordeal had damaged her self-esteem and her sense of purpose as someone who helped people with disabilities "believe that they can be better than other people see them to be."  Trial Tr. 66:1–11.  She testified to having trouble sleeping and lacking energy to look for jobs.  *Id.* at 65:25–66:10, 66:21–67:3.  She took Eastern medicine and talked to a psychologist online, where she hoped to discuss "discrimination" and "feelings [of] self doubt."  Pl.'s Ex. 402.  At some point, she also called a suicide hotline for help.  Trial Tr. 68:17–23.  Pressley testified that she did not seek additional psychological counseling because of the cost.  *Id.* at 67:10–19.

By August 14, Pressley obtained a customer service position at another company, Modena Window Design, where she earned $4,972.50 at a rate of $18.00 per hour. *Id.* at 71:10–72:5, 99:1–15. But she quit and moved to Texas roughly two months later, stating that her depressive symptoms had affected her focus, memory, and energy. *Id.* at 72:4–5, 74:13–21, 99:16–100:5. (Plaintiff's lease also ended around that time. *Id.* at 100:20–23.) In Texas, Pressley applied to five to ten jobs without success and did not work apart from a short-term, ten-to-fifteen-day position in Arkansas for PB Robotech LLC, a logistics company that paid her $1,215.95. *Id.* at 103:18–104:10, 104:24–105:20; Pl.'s Ex. 405. After living in Colorado for three months to fix a trailer she owned, *id.* at 106:21–107:1, where she volunteered to help a friend answer phones at a restaurant, *id.* at 108:1–6, Pressley found her current job at Eastern Cabinet and Stone in June or July 2024, *id.* at 78:11–23. In total, Pressley earned $6,188.45 between her termination and June 1, 2024. Pl.'s Ex. 404; Pl.'s Ex. 405.

### B.    Guo and Dong's Account

Guo and Dong gave a different account of Pressley's day at ABJ.

Guo stated that Pressley had been called in to interview for the office-clerk position, not to start work. *See* Trial Tr. 155:21–156:9. Guo testified that she was not at the office that day. *Id.* at 164:22–23. But she explained the hiring process, which she oversaw: candidates would go to ABJ's office to meet Dong for an interview, and Dong would prepare a basic task for the interviewee to perform. *Id.* at 156:3–5. After completing the task, the interviewee would be told to go home and wait on a hiring decision. *Id.* at 156:6–9. Guo testified that she was responsible for the decision of whether to hire an applicant. *Id.* at 162:7–9. According to Guo, if Pressley had been hired, she would have been paid the minimum wage. *Id.* at 204:24–25.

Guo testified that, on July 27, 2023, Pressley went to the office at 9:00 a.m. for the hiring evaluation, texting Guo once she arrived. *Id.* at 156:15–157:24. She then called Dong so that

5

Pressley could be let into the building—a call that toll records reflect occurred at 8:58 a.m.  *Id.* at 178:3–10.

Dong gave a parallel description, explaining that she met Pressley outside the building and walked her into the office.  Once inside, Dong testified, she asked Pressley about her work experience, explained the duties she would have to perform, provided Pressley a computer, gave her English and Chinese versions of a home-aide contract, and asked Pressley if she could understand the contracts.  *Id.* at 214:14–19.  The process took approximately ten minutes.  *Id.* at 227:5–9.  Dong also taught Pressley how to enter patient data from timesheets onto a computer and instructed her to fill one in herself.  *Id.* at 214:21–215:3.  After Pressley completed the task, Dong checked her work and found that she had entered "the incorrect time, incorrect patient's name, and incorrect home aide's name."  *Id.* at 215:22–216:2.  Dong estimated that Pressley took "[a]pproximately 10 minutes" to complete the timesheets.  *Id.* at 252:8–11.  Dong told Pressley to go home and wait for Guo's call.

Dong testified that she then called Guo about the interview from the hallway outside the office.  *Id.* at 229:19–23.  Phone records establish that Dong called Guo that morning at around 9:21 a.m.  *Id.* at 241:11–18.  According to Dong, she did not inform Guo that Pressley was an amputee during this call.  In fact, Dong claimed, she had not even noticed that Pressley was an amputee at this point.  *Id.* at 217:5–11.  Instead, both Dong and Guo testified on direct examination, Dong reported poor performance.  Specifically, Guo testified to learning from Dong that Pressley "seemed to have some proficiency in English, but on the timesheet" misrecorded some data, and so "was not qualified to be hired."  *Id.* at 158:7–17.  Dong testified that she reported what she "observed on the worksheet" but did not tell Guo about the "amount of time" Pressley took "to

6

complete the" forms. *Id.* at 230:9–13. Guo testified that she then called Pressley and told her she appreciated her coming in but found her not qualified for the position. *Id.* at 158:13–21.

Guo's explanation on direct examination of her hiring decision departed from her prior accounts. In Guo's deposition, Guo stated that Dong had told her that Pressley's English was "not sufficient," suggesting that the hiring decision had been based at least in part on poor English skills. *Id.* at 187:2–10. And in an interrogatory response, Guo stated that Pressley had not been hired because she took too long to complete her work, making no reference to poor quality. *Id.* at 190:16–22. On redirect examination during trial, Guo sought to reconcile the latter two rationales by saying they both played a part, asserting that Pressley was not hired because "she took inordinate amount of time to complete the most basic and the simplest task we gave her incorrectly." *Id.* at 208:15–22.

Guo testified that soon after she told Pressley of her decision, she received a call from Dong, who informed her that Pressley was in the office screaming that ABJ would not hire her because of her disability. *Id.* at 159:6–10, 165:10–12. Dong claimed that it was only during this outburst that she noticed Pressley was an amputee. As Guo and Dong told it, Dong called Guo around 9:30 a.m. to report that her outburst was scaring other employees. *Id.* at 165:18–20, 167:9–15, 216:10–13.

Guo's call records in evidence did not reflect a call from Dong to Guo that day after the call from Guo to Pressley. Guo explained this absence on the ground that the call must have occurred through WeChat, but did not offer WeChat records into evidence. *Id.* at 197:1–3. Dong, for her part, stated in her deposition that her conversations that day had been through "regular cellphone," not through an app like WeChat. *See id.* at 223:12–22.

Guo testified that at Dong's suggestion, she arranged for Dong to pay Pressley $23 so that she would leave, and that at some point afterward, Pressley left the building. *Id.* at 159:21–160:2, 167:18–25, 168:21–25, 217:2–4.

### C.    Analysis

Pressley's account of events on July 27, 2023 was more credible than Guo and Dong's, considering the witnesses' demeanor, the substance of their accounts, and the extent to which their testimony was corroborated by other evidence at trial.

*Shifting and implausible explanations.*  Guo's shifting explanations for her decision not to hire Pressley undermined the credibility of her account.  In her deposition, Guo described Dong telling her that Pressley's "English level was not sufficient," suggesting that her decision was based in part on poor language skills. *Id.* at 187:5–6.  But at trial—where Pressley testified in competent English—Guo said Dong had actually told her Pressley "seemed to have some proficiency in English." *Id.* at 158:8–9.  In interrogatory responses, defendants offered a different explanation for Guo's employment decision—one that is hard to square with Dong's testimony that she never told Guo how long Pressley took to enter in timesheet data, *id.* at 230:9–16—asserting that Guo declined to hire Pressley because her work had been too slow.  On direct examination, Guo changed course.  She stated on direct that it was the quality of Pressley's work, rather than its pace, that fell short. *Id.* at 158:8–12.  Only after being cross-examined about these shifting explanations did Guo seek—on redirect—to combine the latter two rationales, by saying Pressley had taken too long to produce subpar results. *Id.* at 191:1–18.  Guo's changing rationales for her decision severely undercut the believability of each asserted reason, leaving an impression that Guo was casting about for a permissible basis for the hiring decision rather than offering her honest views.

Similarly, Dong's testimony that her call with Guo soon after Pressley arrived at the office was to relay performance concerns, rather than disclose her amputee status, was undercut by

8

Dong's implausible claim that she did not even realize that Pressley was an amputee until after Guo had told Pressley that she would not be hired. Dong acknowledged that she saw Pressley cross the street toward her with crutches on the day of the interview, but said she did not recognize her to be an amputee. *Id.* at 235:5–12. She said she "did not pay attention" to whether one leg of her jeans was pinned up on the morning of the purported interview. *Id.* at 235:9–12. When plaintiff's counsel brought up Pressley's testimony that her pants leg had been pinned up when she went to ABJ that morning—in the same highly visible manner as her pants leg was pinned when she testified at trial—Dong changed her account from saying that she did not remember how Pressley's pants were configured to insisting that her pants were *not* pinned up. *Id.* at 236:19. The Court credits Pressley's testimony that her pant leg was pinned up and she was using crutches to walk when she arrived at ABJ, and finds it implausible that Guo did not notice that Pressley was an amputee.

*Workday timeline.* Plaintiff's account of the reason for Guo's employment decision is the more plausible one when considered against the timing of the key events. There was no dispute at trial that Pressley arrived at ABJ just before 9:00 a.m.; that Dong called Guo regarding Pressley at 9:21 a.m., and that Guo informed Pressley that she would not be employed at ABJ about ten minutes after that. *See id.* at 182:25–183:19, 240:24–241:22. There was also no dispute that during the short interval between Pressley's arrival and Guo's rejection call, Dong gave Pressley an initial orientation about ABJ's work, showed her some sample documents, and set her up on a computer workstation—leaving only minutes for Pressley to perform data entry (and for Dong to purportedly evaluate that work) before the call from Dong to Guo. *See id.* at 213:19–25, 214:14–24, 215:4–9, 252:8–11. It is more plausible that the information Dong relayed to Guo just minutes into Pressley's time at the office was that Pressley had a visible disability than that Dong relayed that

Pressley's skills had been deficient based on a tryout that could only have lasted a few minutes. Indeed, the extremely limited time Pressley would have had available to work especially undercuts the plausibility of Guo's assertion that she had found Pressley an unsuitable employee because of the slow pace of her work.

*Corroboration.* Phone and electronic records entered into evidence at trial further bolster Pressley's account while undermining defendants'. Plaintiff testified that after Guo dismissed her based on her disability, she was so distraught that she sat in her car and cried, called friends and communicated with them on the WeChat service to explain what had occurred, and described the events in an electronic note. *See id.* at 40:23–41:16; 47:2–4. That account is corroborated by phone records demonstrating that she had lengthy conversations with several friends shortly after leaving ABJ, and by WeChat records, including one in which a friend advised her about finding a lawyer. Pl.'s Ex. 302; Trial Tr. 47:9–19; 51:11–19; Pl.'s Ex. 607. Her statements also cohere with an electronic note she wrote to document her conversation with Guo. Trial Tr. 45:7–12, 92:15–19; Pl.'s Ex. 305; Pl.'s Ex. 608.

In contrast, defendants' account was hard to square with the electronic evidence. Guo testified that after she rejected Pressley, Dong called to tell her Pressley was screaming and disturbing other employees in the office, but cell phone records introduced at trial contain no entry corroborating a call from Dong to Guo about Pressley's alleged screaming. Trial Tr. 196:23–197:3; *see id.* at 238:24–239:1. Guo's response—that Dong called her on WeChat, a Chinese messaging application, so there was no such record, *id.* at 197:4–12, 222:15–20—was not credible. Dong never mentioned WeChat when the parties reviewed the call records in prior depositions, *id.* at 224:2–4, 240:2–12; to the contrary, Dong testified that her communications with Guo that day had been by "regular cellphone," rather than using a software program, *id.* at 222:17–18. While

10

these communication records do not themselves establish the substance of the key players' conversations, the better correspondence between plaintiff's account and this electronic data reinforces Pressley's credibility and undercuts that of the defense witnesses.

In sum, I credit Pressley's account of the events of July 27, 2023. She arrived expecting to work at ABJ until Guo called her, asked her why she did not disclose her disability, and then fired her. That led her to continue working in silence until Dong gave her an envelope with $23 and said that she could leave. Guo was the only witness to testify about the wage that the ABJ position would have carried, so I credit her testimony that she would have paid minimum wage had she hired Pressley.

## CONCLUSIONS OF LAW

### I.    Liability

Plaintiff has shown by a preponderance of the evidence that defendants violated Title I of the ADA, the Rehabilitation Act, the NYSHRL, and the NYCHRL by terminating her because of her disability.

Because the four claims share much in common, I assess them together. Both parties view this case through the *McDonnell Douglas* burden-shifting framework, which courts in this Circuit have applied to discrimination claims under the ADA, Rehabilitation Act, and NYSHRL. *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48–49 (2d Cir. 2002), *abrogated on other grounds*, *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 112 F.4th 93, 99 (2d Cir. 2024) (ADA and Rehabilitation Act); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 n.4 (2d Cir. 1995) (NYSHRL). While a legal framework that is more generous to plaintiffs may apply under the NYCHRL and the NYSHRL as currently amended, *see Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013) (discussing NYCHRL); *Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314, 321 (S.D.N.Y. 2021) (discussing 2019 amendments to the NYSHRL),

the Court need not decide that issue because plaintiff has proven her discrimination claims even under standard set out in *McDonnell Douglas.*

Under the *McDonnell Douglas* framework for assessing discriminatory intent from circumstantial evidence, plaintiff must establish a *prima facie* case of disability discrimination. If she does, the employer must offer evidence of "a legitimate non-discriminatory reason" for its actions. *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (ADA); *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 721–22 (2d Cir. 1994) (Rehabilitation Act); *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (NYSHRL). Plaintiff, who bears the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated" against her, may rebut the employer's explanation by showing that it was pretextual, or that a discriminatory reason "more likely motivated the employer." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253, 256 (1981).

To show a *prima facie* case, plaintiff must establish four elements: (1) the employer is subject to the statute, (2) the plaintiff is disabled under the statute, (3) the plaintiff was "otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation"; and (4) the "plaintiff suffered [an] adverse employment action because of her disability." *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004) (alteration in original and citation omitted). The parties stipulate that ABJ is a covered entity, Tr. Stipulation ¶ 1 (Dkt. #23), and neither party challenges that plaintiff was disabled. At issue are the latter two elements.

A preponderance of the evidence shows that plaintiff was qualified for the office-clerk position. A job applicant is "otherwise qualified" if she can "perform the essential functions of that job, either with or without a reasonable accommodation." *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 99–100 (2d Cir. 2003) (citation omitted). The essential functions of the office clerk

role consisted of answering English-language phone calls and performing data entry for the home aides' timesheets. Trial Tr. 213:19–215:3. The Court credits Pressley's testimony that she knew English—the language in which she testified. The Court further credits Pressley's testimony that she adequately performed her data entry tasks—tasks that Pressley testified she had years of experience doing. *Id.* at 20:13–20; Pl.'s Ex. 203. Therefore, plaintiff was qualified for the office clerk role.

The Court also finds that defendant ABJ fired Pressley because of her disability. Pressley testified that Guo, who oversaw employment decisions at ABJ, called her twenty minutes after she arrived at the office to confront her about her amputee status. Trial Tr. 36:19–25; 37:1–4 . Guo then mentioned that the job required driving and delivering papers—two previously undisclosed job duties that Guo apparently believed left-leg amputees could not perform. *Id.* at 37:1–20. When Pressley responded that she could do those things, Guo insisted that she still could not work at ABJ. *Ibid.* Guo's statements are strong evidence that ABJ terminated Pressley because of her disability status.

At the next stage of the *McDonnell Douglas* analysis, while defendants put forward non-discriminatory justifications for their employment decision—Pressley's supposed errors and slow pace at data entry—the testimony supporting this rationale was not credible, and the Court finds it more likely that defendants were motivated by a discriminatory reason in declining to allow plaintiff to work at ABJ. Therefore, plaintiff establishes a valid claim under all four statutes.

Defendants object that Guo did not know Pressley was disabled on July 27. It is true that ABJ could not have subjected Pressley to disparate treatment because of her disability if ABJ was "entirely unaware" of it. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7 (2003). But for the

13

foregoing reasons, the Court does not credit Dong's testimony that she did not notice Pressley's disability until her alleged outburst at the office, nor Guo's testimony that Dong did not tell her.

For the foregoing reasons, the Court finds ABJ liable under all four statutes. The Court also finds Guo liable under the NYCHRL and NYSHRL only. Courts in this Circuit uniformly hold that individual defendants are not liable under the ADA or Rehabilitation Act. *Morales v. N.Y. Univ.*, No. 22-CV-6452 (RPK) (LB), 2023 WL 1785546, at *3 (E.D.N.Y. Feb. 6, 2023) (collecting cases); *see Goe v. Zucker*, 43 F.4th 19, 35 (2d Cir. 2022). But because Guo managed recruitment at ABJ and "actually participate[d] in" discrimination by terminating the plaintiff, she is individually liable under state and city law. *Feingold v. New York*, 366 F.3d 138, 157–59 (2d Cir. 2004).

## II.    Damages

Plaintiff is entitled to back pay with pre-judgment interest, emotional damages, and punitive damages.

### A.    Back Pay

Plaintiff is entitled to $20,068.55 in back pay. The ADA and Rehabilitation Act entitle a successful plaintiff to "the same remedies that would be available" under Title VII. *Sands v. Runyon*, 28 F.3d 1323, 1327 (2d Cir. 1994); 42 U.S.C. § 12117(a). One such remedy is back pay, which the court "may" award in its equitable discretion. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 415–16 (1975). Back pay is also available under the NYCHRL and NYSHRL. N.Y. Exec. Law § 297(4), (9); N.Y.C. Admin. Code § 8-502(a). Courts calibrate back-pay awards to "completely redress the economic injury the plaintiff has suffered" from the employer's discrimination. *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993) (citation omitted).

14

That benchmark requires courts to calculate what the plaintiff would have earned absent the discriminatory act. *See id.* at 144–45. Typically, a wrongfully terminated employee may recover back pay "from the date of the discriminatory action to the date of judgment." *EEOC v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 122 (2d Cir. 1999); *Clarke v. Frank*, 960 F.2d 1146, 1151 (2d Cir. 1992). But the plaintiff "must attempt to mitigate her damages by using 'reasonable diligence in finding other suitable employment.'" *Dailey v. Societe Generale*, 108 F.3d 451, 455 (2d Cir. 1997) (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982)). "This obligation is not onerous and does not require [plaintiff] to be successful," *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 695 (2d Cir. 1998), and the defendant bears the burden of proving a lack of reasonable diligence, *Dailey*, 108 F.3d at 456. Any award is reduced by the plaintiff's "[i]nterim earnings or amounts earnable with reasonable diligence." 42 U.S.C. § 2000e-5(g)(1).

The Court finds that the back-pay period began on plaintiff's first day at ABJ on July 27, 2023, and ended on June 1, 2024. Pl.'s Proposed Findings of Fact 14, 20 n.10 (Dkt. #25). Plaintiff testified that she intended to work at ABJ indefinitely. Trial Tr. 81:22–82:6. After the incident, plaintiff did not find regular employment until "June or July" 2024, when she found a new job at Eastern Cabinet. *Id.* at 78:18–19. Because Eastern Cabinet pays plaintiff a $3,000/month salary that exceeds her expected wage at ABJ (assuming 40-hour workweeks), the Court calculates back pay up to June 1, 2024—the last date established she was out of work before beginning her position at Eastern Cabinet.

Plaintiff's wages during the brief periods when she worked for Modena Window Design and PB Robotech LLC are deducted from her damages award. Damages are designed to "completely redress" a plaintiff's losses suffered "as a result of" a discriminatory act. *Saulpaugh*,

15

4 F.3d at 145 (citation omitted). Because plaintiff was paid $18.00 per hour at Modena and between $10.13 and $15.20 per hour at PB Robotech, Trial Tr. 104:1–2 (noting plaintiff worked for 10 to 15 days at PB Robotech for $1,215.95); Pl.'s Ex. 405; Pl.'s Ex. 403, redressing plaintiff's injury requires the Court to subtract these earnings from the wages plaintiff would have earned at ABJ but for her termination. But completely redressing plaintiff's injury does require awarding backpay from the date she left Modena—where she earned a higher rate than she would have been paid at ABJ—until the date she began work at Eastern Cabinet, because plaintiff credibly testified that she was unable to remain in the position at Modena because of depression she suffered as a result of defendants' conduct.

Consistent with Guo's testimony, the Court finds that during the period for which Pressley is entitled to back pay, she would have earned New York City's base minimum wage. Plaintiff contends that she would have been paid the "prevailing minimum wage rate in the home healthcare industry," or $17.00 per hour in 2023 and $18.55 per hour in 2024. Pl.'s Proposed Findings of Fact 21. But those rates apply only to "home care aide[s]." N.Y. Pub. Health Law §§ 3614-c, 3614-f. Though ABJ is a home-care company, plaintiff has not shown that her office-clerk role qualified for the higher rate. Absent contrary evidence, the Court applies New York's general minimum wage: $15.00 per hour in 2023 and $16.00 per hour in 2024. N.Y. Lab. Law § 652. Taking plaintiff's calculations that she would have worked 107 eight-hour workdays in 2023 and 105 eight-hour workdays in 2024, the Court finds that plaintiff would have earned $26,280.00, less $6,188.45 in interim income and the $23 Dong gave her. The difference, $20,068.55, measures plaintiff's damages.

Defendants suggest that plaintiff failed to "act reasonably in attempting to gain other employment." Defs.' Proposed Findings of Fact 4 (Dkt. #24). But their unadorned assertion fails

16

to establish that plaintiff acted unreasonably. Plaintiff testified that she obtained alternate employment at Modena, until her depressive symptoms made her quit and move to Texas. Trial Tr. 73:4–74: 21. And in Texas, plaintiff applied to five to ten jobs. *Id.* at 104:24–105:2. She also drove to Arkansas to obtain short-term employment at PB Robotech. *Id.* at 75:4–13. These unchallenged facts demonstrate due diligence in these circumstances.

### B.        Pre-Judgment Interest

The Court issues pre-judgment interest on plaintiff's back pay award, to be calculated based on "the average rate of return on one-year Treasury bills for the relevant time period between the time the claim arises until the entry of judgment." *Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 264 (S.D.N.Y. 2007) (explaining that this is the prejudgment interest rate most commonly used for federal claims); *see Gem Fin. Serv., Inc. v. City of New York*, No. 13-CV-1686 (RPK) (RER), 2023 WL 5831129, at *3 (E.D.N.Y. Sept. 8, 2023). While this Court has discretion over pre-judgment interest as a general matter, "it is ordinarily an abuse of discretion *not* to include" it for lost wages. *Gierlinger v. Gleason*, 160 F.3d 858, 873 (2d Cir. 1998). Moreover, a federal interest rate such as the one noted above is appropriate for pre-judgment interest on the claims against ABJ, because this Circuit uses a federal interest rate when a defendant is liable "on both state and federal law with respect to which no distinction is drawn." *Thomas v. iStar Fin., Inc.*, 629 F.3d 276, 280 (2d Cir. 2010). That rate is also appropriate to use for the claims against Guo. While Guo is liable only for state-law claims, she is jointly and severally liable for back pay with ABJ, which is liable under both federal and state law. Courts in this Circuit have used a federal interest rate for the joint award in similar circumstances, *see, e.g.*, *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 94, 105 (E.D.N.Y. 2020); Amended Judgment, *Thomas v. iStar Fin., Inc.*, No. 05-CV-606 (VM) (RLE) (S.D.N.Y. Dec. 12, 2007), and neither party has advanced a basis for using a state interest rate here. Interest shall be paid for the period from December 30, 2023,

17

through the date of entry of judgment, compounding annually. *Sanderson v. Leg Apparel LLC*, No. 19-CV-8423 (GHW), 2024 WL 898654, at *5 (S.D.N.Y. Mar. 1, 2024) (collecting cases using "midpoint of the economic damages period" to begin calculating interest where damages were incurred at various times).

### C.    Emotional Distress

Plaintiff is awarded $80,000 in damages for emotional distress under the NYCHRL, the NYSHRL, and Title I of the ADA. The NYCHRL, the NYSHRL, and Title I of the ADA authorize emotional-distress damages. *Moreno v. Capital Concrete NY Inc.*, No. 24-CV-3120 (NGG) (PK), 2025 WL 2555609, at *11 (E.D.N.Y. Sept. 5, 2025) (collecting cases). Emotional distress damages are not available under the Rehabilitation Act. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 230 (2022).

Claims for emotional distress in this Circuit are often grouped in three categories: "garden-variety," "significant," and "egregious." *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 578 (S.D.N.Y. 2010) (citation omitted); *see Rainone v. Potter*, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005). In the first category, "evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of" it. *Olsen v. County of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) (citation omitted). These claims typically merit damages between $30,000 and $125,000. *Santiago v. Crown Heights Ctr. for Nursing & Rehab.*, No. 15-CV-4381, 2017 WL 9482107, at *23 (E.D.N.Y. Feb. 24, 2017) (collecting cases). "[S]ignificant" claims, by contrast, typically involve "medical, psychological, or therapist evidence of substantial, long-term psychological harm," *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 320 (S.D.N.Y. 2018); *see Antoine*, 489 F. Supp. 3d at 96, and often receive awards between $50,000 and $200,000, *Claud v. Brown Harris Stevens of Hamptons, LLC*, 676 F. Supp. 3d 100, 139 (E.D.N.Y. 2023). Courts in this Circuit,

18

however, have issued $100,000 awards for emotional distress only where it manifested in "severe emotional or physical reactions." *Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 193 (E.D.N.Y. 2012) (citation omitted).  Plaintiff requests a $125,000 award; defendants suggest $25,000–$35,000.

Pressley's damages fall between the garden-variety and significant categories.  Plaintiff adduces no testimony from medical professionals and provides limited documentation of her harm.  But she describes her injury in terms that go beyond "vague and conclusory": trouble sleeping, diminished energy, reduced focus, and lowered self-esteem that led her to quit her job at Modena.  Trial Tr. 66:1–11, 74:13–21.  Corroborating the severity of her symptoms, plaintiff called a suicide hotline, took Eastern medicine, and sought online counseling.  At the same time, plaintiff did not obtain ongoing mental health counseling, *id.* at 69:24–70:5, and the documentary evidence provided, a single conversation with a psychologist online, Pl.'s Ex. 402, falls short of medical testimony.

On these facts, plaintiff is awarded $80,000 in damages.  This award comports with similar ones in this Circuit for plaintiffs who experienced "ridicule, humiliation, anger and depression." *Lynch v. Town of Southampton*, 492 F. Supp. 2d 197, 206 (E.D.N.Y. 2007) ($50,000); *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 258–59 (2d Cir. 2005) ($50,000 in 2005 dollars for plaintiff who did not seek medical treatment but experienced humiliation, lost interest in family activities, and began to "lash" out at his family).  Other courts have permitted greater awards for plaintiffs who required medical treatment or otherwise suffered physical symptoms.  *Ginsberg v. Valhalla Anesthesia Assocs., P.C.*, No. 96-CV-6462 (HB), 1997 WL 669870, at *4 (S.D.N.Y. Oct. 28, 1997) ($100,000 for plaintiff who testified to seeing psychiatrist and taking anti-depressants); *Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012) (discussing case upholding $125,000 award

19

given testimony evidence of "shock, nightmares, sleeplessness," and "humiliation"). Plaintiff's symptoms and attempts to seek treatment confirm that an $80,000 award is appropriate.

### D.    Punitive Damages

The Court authorizes $50,000 in punitive damages against ABJ under the ADA and NYCHRL. The Court may award punitive damages under the ADA if the defendant acts "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). An employer acts with malice by discriminating "in the face of a perceived risk that its actions w[ould] violate federal law." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999). Under the NYCHRL, punitive damages are available if defendants discriminate "with willful or wanton negligence," "recklessness," or a "conscious disregard of the rights of others"—a lower standard. *Chauca v. Abraham*, 885 F.3d 122, 124 (2d Cir. 2018) (citation omitted). Punitive damages are not available here under the NYSHRL or Rehabilitation Act. *See Chauca v. Abraham*, 841 F.3d 86, 95 (2d Cir. 2016); *Cummings*, 596 U.S. at 230.

Punitive-damage awards are "by nature speculative" and "arbitrary," *Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013), but three factors guide the Court's hand: the "reprehensibility of the defendant's misconduct," "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award," and "the difference between the punitive damages awarded . . . and the civil penalties authorized or imposed in comparable cases," *Thomas v. iStar Fin., Inc.*, 652 F.3d 141, 148–49 (2d Cir. 2010) (describing the Supreme Court's "'guideposts' for courts reviewing [punitive damages] awards"). Plaintiff proposes a $200,000 award, while defendants contend that plaintiff failed to prove that they acted with malice or reckless indifference.

Plaintiff is entitled to punitive damages because ABJ consciously disregarded the ADA's anti-discrimination provisions and acted with reckless disregard of plaintiff's rights under the

NYCHRL.  ABJ's employment agreement referenced the ADA and stated that company policy barred disability discrimination in hiring.  Trial Tr. 201:9–18.  Guo, who managed ABJ's personnel decisions, confirmed that she understood that "denying someone employment on the basis that they're an amputee . . . violates the law."  *Id.* at 201:25–202:3.  Given those uncontested facts, Guo's (and ABJ's) decision to terminate plaintiff because of her status as an amputee reflects the kind of conscious disregard warranting deterrence.

The Court finds a $50,000 punitive-damages award against ABJ appropriate.  All discrimination in violation of the ADA and related statutes is wrongful.  Nevertheless, the record does not suggest ABJ's conduct was part of a repeated course of conduct, and ABJ accompanied its decision here with compensation for an hour at the office and an apology for wasting Pressley's time—circumstances that render ABJ's conduct somewhat less reprehensible than cases in which the circumstances of the wrongful conduct are more outrageous.  At the same time, Guo's treatment of Pressley as the one who managed "compliance with ADA" rules, Trial Tr. 162:10–12, increases the reprehensibility of ABJ's conduct.  *Kuper v. Empire Blue Cross & Blue Shield*, No. 99-CV-1190 (RMB) (MHD), 2003 WL 359462, at *9 (S.D.N.Y. Feb. 18, 2003); *cf. Luciano v. Olsten Corp.*, 912 F. Supp. 663, 670 (E.D.N.Y. 1996).  A $50,000 award, moreover, does not eclipse the Court's $100,068.55 award for back pay and emotional distress.  The subtotal for non-back-pay relief—$80,000 for emotional distress and $50,000 in punitive damages—also comports with the $200,000 federal cap on the sum of emotional and punitive damages awards under Title I for companies with between 200 and 501 employees.  42 U.S.C. § 1981a(b)(3)(C).  Such an award is, finally, familiar in this Circuit, where courts have remitted damages to $40,000 (in 1998 dollars) for employees fired on the basis of their race.  *Rivera v. Baccarat, Inc.*, 10 F. Supp. 2d 318, 333 (S.D.N.Y. 1998), *vacated on other grounds*, 205 F.3d 1324 (2d Cir. 2000).

Plaintiff is awarded a $10,000 punitive-damages award against Guo under the NYCHRL. In assessing the award amount, New York law requires courts to "consider the wealth of the defendant" and her ability to pay the penalty. *Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 267 (S.D.N.Y. 1999). The record is devoid of evidence about Guo's assets, leaving this Court reluctant to issue an award that exceeds its deterrent effect. And Pressley testified that Guo might identified herself as an "owner" of ABJ, in which case the award against defendant ABJ would likely deter her too. Trial Tr. 37:17.

## CONCLUSION

Plaintiff is entitled to judgment on her claims that defendants discriminated against her because of her disability in violation of Title I of the ADA, the Rehabilitation Act, the NYSHRL, and the NYCHRL. Plaintiff is therefore entitled to (1) $20,068.55 in back pay for defendants' violation of all four statutes, plus pre-judgment interest; (2) $80,000 in damages for emotional distress for defendants' violations of the ADA, NYSHRL, and NYCHRL; (3) $50,000 in punitive damages against ABJ for violations of the ADA and NYCHRL; and (4) $10,000 in punitive damages against Guo under the NYCHRL.

SO ORDERED.

 /s/  Rachel Kovner
RACHEL P. KOVNER
United States District Judge

Dated: March 31, 2026
    Brooklyn, New York